UTSA Apartments, L.L.C. v. UTSA Apartments UTSA Apartments, L.L.C. Okay. And I'm ready to go for it, Your Honor. Come on down. Good morning, Your Honors. I have two clients in this case. Woodlark UTSA Apartments, L.L.C., an asset manager for the preserve apartments in San Antonio. That client was sued for breach of fiduciary duty. My second client, UTSA Apartments, L.L.C., was a co-owner in the reserve. It was not sued for breach of fiduciary duty or for anything else. The bankruptcy court granted relief against both of my clients despite the fact that no relief was ever sought against UTSA Apartments. Now, we believe that both of the bankruptcy court's judgments are flawed and should be reversed. I'd like to start with my first client, UTSA Apartments. It owned a 21.17 percent undivided interest in the reserve. This was a property that was sold. It ends up owning 21 percent. It ends up. It started with 1.97. It acquired an additional 19.2 percent from entities that were not part of the bankruptcy proceeding. And so at the time the property was sold and the time came to distribute the funds, its interest was 21.17 and the debtors do not dispute that. How did it acquire those other interests? It acquired them through negotiations with the non-debtor parties and there were deeds. Were these acquired in a fairly short span of time? And in particular, were they acquired at a time in which the tenants in common were being called upon to pay or sell? They were acquired over a period from November of 2015 to February of 2016. So I would agree that three months is a relatively short period of time. The tenants in common were in default on their obligations to repay money advanced by Woodlark. They were in default on their payments. What was the performance level at the time of the entire complex? I'm sorry, I don't follow the question. Well, my question was, why were they suddenly in three months in default? They had been in default for approximately a year. And Woodlark sent a number of notices for performance under the agreements governing the transactions. And finally they escalated to the point where they initiated the call process under the Declaration of Call Agreement. That notice was sent in September of 2015. And at that point the non-defaulting tenants in common, which consisted of UTSA and My question goes to the suggestion that's made that what you have is the managers are not performing adequately and they're causing the difficulties. And then as these difficulties are created, they take advantage by buying up those interests. And the record does not show that the difficulties were caused by Woodlark's poor performance. There was a lot of testimony about adverse What does the bankruptcy court find, if anything, in that regard? It did not find that Woodlark performed in a substandard manner. It was silent on that. What about breaches of fiduciary duty? UTSA apartments did not owe a fiduciary duty to the other tenants in common. And therefore it could not have breached that duty. The bankruptcy court did find that Woodlark breached its fiduciary duty by the way that it handled the call process. What was the relationship between Woodlark and UTSA? They had a common owner. So they would be affiliates. However, they were separate legal entities. How much did UTSA pay for this additional percentage of the property? They did not. The consideration was for giving the amounts owed by these entities to Woodlark and also indemnifying against the claims of the secured lender. At the time that these transactions were done, there was no contract for sale of the property out there, and there was a risk to the tenants in common that they could be pursued for a deficiency on the note. One of the things I recall from the briefing is that part of the non-performance here by the managerial group was a failure to attend properly to the taxes and recoveries and monies that were out there available, and they didn't bring those in. That is an allegation that was made. The testimony in the record What did the bankruptcy court find? The bankruptcy court found that Woodlark delegated the responsibility to pursue the tax refund to the tenants in common. The testimony was that that was done at the request of the tenants in common. There was quite a bit of testimony as to what did Woodlark know and when did they know it, because apparently what happened was the attorney retained by the tenants in common had negotiated a settlement in a mediation a year earlier, and it was not until October of 2015 after they had obtained an engagement agreement signed by Woodlark that they suddenly said, good news, we have a settlement from last year, and then the money actually came in in January of 2016 after the bankruptcies had been filed. However, that money in the amount of about $250,000 would not have had a material impact on the calls that were being made. There were three calls made, one for $45,000, one for I believe about $350,000, and then a third larger one. What would have happened is if the tax money had come in sooner, the first call would not have been necessary, the second call would have been reduced, and the third one would have been unaffected. However, had these monies not come in during the bankruptcy, there would have been greater shortfalls during the pendency of the bankruptcy, and Woodlark would have had a larger administrative claim. Woodlark filed two motions to recover administrative claims for amounts advanced during the bankruptcy, and the Bankruptcy Court granted both of those. What is your explanation for the failure of this whole enterprise? What was the underlying economic circumstance that pulled this down? The initial problem was that the Tenants in Common requested that they bring in an independent property manager to take over from Woodlark, and Woodlark agreed to that request, and that they would adequately maintain it, paid itself its management fees at a time when it was not paying vendor debt. And so when Woodlark took the property back in April of 2015, it was already reeling from mismanagement under the property manager chosen by the Tenants in Common. And so they were not able to recover the property, and they were not able to pay vendor from that. But even under the prior manager, their budgets were saying this property is not going to be able to cash flow, which is why Woodlark started meeting with the Tenants in Common to come up with a plan to solve this cash flow problem in the fall of 2014 when the property was still under the prior management. I appreciate that explanation. Are you saying that this was not a mismanagement? I mean, this was wholly mismanagement, and it wasn't a structural failure itself? In other words, this entire arrangement was not flawed from the outset, but rather it was just mismanaged by that interim manager, and that's the cause of this? Yes, it was a combination of mismanagement by the prior manager and a soft market in general. And I know there is more testimony in the record. It's not coming to me immediately. But the important thing is the bankruptcy judge did not find that Woodlark triggered a cash flow problem. And in fact, the cash flow shortages started when Woodlark was not the property manager. I thought that was sort of the narrative that was urged but that the bankruptcy court didn't accept, that ultimately the bankruptcy court, you know, with reference to the whole picture and your client's repeated resistance to higher buyers, the 30 million plus folks, he said that or seemed to imply, going to this ownership interest question in 363J, that the bankruptcy judge, his view, I thought, was it's a similar corporate structure, and by not seeking these tax refunds, there should never have been a call in the first place. All the tenants in common were in this group that were sort of alarmed falsely. And on top of that, then none of the tenants in common are told that the appraiser that says it's worth 28 million is actually an interested buyer. And from that sort of constellation, he says, especially if UTSA didn't even sign the call agreement, they couldn't have acquired the ownership interest at all. Right? Isn't that the logic? And therefore, an equitable remedy exists to treat them similarly as alter egos, and they don't get that 21 percent. Except that they, the plaintiffs attempted to sue UTSA for alter ego. They filed a fourth amended complaint without leave of court, and the bankruptcy court struck that pleading. And so you cannot grant a remedy, equitable or otherwise, against somebody who has not been sued. And I understood that from your briefings. That's the essence of your argument to us there's a reversible error. It is that there was a procedural defect. So what's the remedy you get? The remedy is that you must follow the clear dictates of Section 363J and make distribution according to the interest that UTSA held at the time that the sale occurred, which is 21.17 percent, not 3.14 percent. Now, going back to your question And just your best authority for that, because that is a question I always ask. Yes. What's your best authority? Law v. Siegel, the Supreme Court decision in 2014 that said that a court cannot use an equitable remedy to override a mandate of the bankruptcy code. And we determine ownership as well as interest as of what point? As of the time that the funds are to be distributed. Because Section 363J says, upon a sale taking place, the trustee shall distribute the funds to the estate and to the non-debtor parties according to their interests. But the date of filing of the petition is irrelevant? It is, Your Honor. Because the only relevance that it has is that if there were not co-owners on the date of the petition, you could not resort to Section 363H to authorize the sale. However, the as of the petition language is in 363H, but not 363J. And so I do want to go back to your comment on the bankruptcy court's findings. Because the bankruptcy court saying the calls would not have been necessary is wrong as a matter of math. There were $800,000 in calls. There were $250,000 of tax refunds. And the tax refunds would not have eliminated the necessity for the call. Is that essential to your argument? I think it rebuts that point. Further, with the fact, you know, the alleged nondisclosure that the appraisal was prepared by a third party, the package that was sent to all of the tenants in common in connection with the letter exercising the call included the appraisal which said this appraisal is prepared for Safanad. And so Woodlark fulfilled its duty of candor to provide the tenants in common with the actual appraisal so they could read it for themselves, they could get their own appraisal, they could contest it. They had any number of avenues available to them, but what they chose to do was to file bankruptcy and get the benefit of the automatic injunction, get the ability to sell the property without the joinder of all of the owners, and in that way they were able to put off having to pay the arrearages that had arisen over a period of time. And really, with UTSA, which is where I've spent most of my time, it's a matter of, number one, the bankruptcy code says they get the money as their interest existed. Number two, they were, there was a violation of due process because there was never any suit brought against them seeking to disallow their interest. But was there an attempt to bring them into the suit? Yes. That was the fourth amended complaint. Was it denied by the bankruptcy court? Yes. So if we were to rule in your favor, you say we would render, would we, could we or would we possibly also, on an alternative, send it back to the bankruptcy court to grant that amendment and review the matter again? No. I believe that having gone through the trial, the bankruptcy court ruled that the amendment was untimely and that bringing in new parties at such a late date would be prejudicial, and so I believe that the only course is to reverse and render. How would it be prejudicial other than you would lose? This took place after the deadline for amending pleadings had expired, after the period for discovery had expired, and, you know, bringing in two new defendants would have disrupted the trial schedule. Thank you, Your Honors. You still have some time left for rebuttal. May it please the Court. I'm Sarah Murray, and together with Mr. Gregg, who is here in the courtroom today, and Mr. Terry, who was not able to be here today, we represent the 19 appellees in this appeal. I listened carefully to the Court's questions in response to Mr. Sather's argument, and I agree with the Court that this is a case where the bankruptcy court was focused primarily as a starting point, at least, on the breaches of fiduciary duty committed by Woodlark that was serving as both the property manager and the asset manager in the handling of the reserve, which was the property of interest and the property that my client's own tenancy and common interest in. There were multiple breaches of fiduciary duty. This trial spanned five days, and there were multiple breaches of fiduciary duty. There was failure by Woodlark to make honest and full disclosure of all important information and to fully and accurately inform the principles, including my client's, of important matters, including without limitation the fact that the note, the $30 million promissory note, was in default. This is something that came to the attention of the debtor ticks, much to their surprise and alarm. They refused to allow the debtor ticks to examine the books or to conduct an audit, even though the documents said that that was their right to do that. Woodlark said, without a court order, you're not going to get an audit. They will tell you that that's because that day it was inconvenient, blah, blah, blah, but the reality was the relationship between the ticks and Woodlark was contentious and adversarial almost from the very beginning. There was at the same time this dynamic going on in which Woodlark and his sister company, UTSA, both of which were owned by the same man, Mr. Rosenblum, were trying to, it appears anyway looking at the record and the events in retrospect, trying to set this situation up so that the value of the reserve would be driven to the ground, the value of the reserve would be won out or that they would need to get out of the investment. And then at that point in time, UTSA and Woodlark could do whatever, and this is what they attempted to do, whatever they could do to get those interests back and not have to pay for them. Other breaches of fiduciary duty, and this goes to the issue of the entire way in which the reserve was handled and managed was itself an act of disloyalty or a breach of fiduciary duty, if you will. He didn't spend much time disputing the breaches of fiduciary duty by Woodlark in oral argument, opposing counsel. No, he did not. So for me, I mean, there is a way of looking at this that the contractual arrangements were very unfavorable to the debtor ticks, and then the economy seems to have gone down and Woodlark, by virtue of having UTSA, did have almost a veto that could stymie your clients and then, therefore, arguably runs into the fiduciary duty breaches. But none of that gets me to how can UTSA be disgorged of ownership interests it acquires from parties that gave over their interests. That's sort of the hardest question. And I think that the starting point there is, first of all, that UTSA was not disgorged of ownership interests. It's important to note that at the time of the petition date, which is the relevant date under 363H and J, on that date, UTSA... But he has no case law for that. And my case is the Maruco case. Let's see if I can give the Court a slide, but it's in the brief, yes. And there's a — I would concede to the Court there's a paucity of legal authority. But does Maruco stand for we ascertain ownership as of that date, or we ascertain the interests, you know, the ownership interests as to its amount? It would make sense to me that we would figure out who were the owners as of that date, but it wouldn't necessarily mean that others couldn't cede their ownership to UTSA later, all the way up until the sale, right? For purposes of determining — let's see if I can — although Section 363J does not 363H — guides us to look to the petition date. But why wouldn't that just be to — so we know the full array of owners, rather than deciding whether it's 3 percent or 21 percent? I mean, they do arm's-length negotiations, and the others that were in arbitration made that route. They — On the petition date, UTSA owned 1.97 percent. Right. When it was time to pay on the note and do other things, UTSA was content to have 1.97 percent. When there was some thought that they could cash in on a larger interest, and following all of the demands that were made for — or the calls that were made, UTSA decided it would be beneficial to try to gather up for virtually nothing the interests of owners who didn't want to fight, unlike the debtor ticks, didn't want to fight, weren't part of the state court litigation, and so on. On the date that the sale occurred — Yeah. I mean, not the sale occurred, the distribution, or the money was to go — the decision was made about how the money would go out. UTSA had zero interest in the property, if we want to talk about that date, because it had already been sold to Eris. All of the interests in the reserve — Is that your argument? Pardon me? No. My argument is this, that the bankruptcy court did not take UTSA's property, did not take UTSA's interest. The bankruptcy court imposed a constructive trust on part of the events that occurred as a result of Woodlark's breach of fiduciary duty. So you have Woodlark's breach of fiduciary duty — But even if you were true, wouldn't the money go back to the other debtors rather than to your clients? Some of the money went — some of the money went to the non-debtor ticks who did not settle up with UTSA. Right. Some of the money went to the debtor ticks, and then this category of 19.19 percent of people who had settled with UTSA was then distributed pro rata to the debtor ticks and, of course, the non-debtor ticks that had already previously been paid, as well as to UTSA. So UTSA, in the end, ended up with 3.14 percent of the proceeds — of the proceeds. The bankruptcy court was making an in-rem decision regarding how to distribute sale proceeds that were property of the bankruptcy estate, as was within its exclusive in-rem jurisdiction to make those sorts of determinations. It did not divest UTSA of its property interest. It simply said that because of Woodlark's breach of fiduciary duty, we are not — I am not — this court is not going to permit Woodlark to benefit. It's going to forfeit all of its fees except for those things that it actually advanced by way of cash advances to help the reserve. And in addition, its affiliate, UTSA, is not going to be able to benefit from its gathering up of all these interests at the last minute, which would not have happened but for Woodlark's breaches of fiduciary duty. Now, did you seek a constructive trust in state court or bankruptcy court or the amended complaint? Where was there a request for a constructive trust? There was a request for fee forfeiture in the pleadings in the third amended complaint. There was — there was not a request specifically for constructive trust, although that is what happens — that is the remedy when there is a breach of fiduciary duty and the consequences involved, as did in this case, third party and the property now is beyond the reach of the person immediately in front of the court. The action is in REM. It's against the proceeds of the sale. It's not against UTSA per se. So UTSA did not have to be part of the litigation because it wasn't part of this litigation? It came into the bankruptcy court seeking to be paid. It wanted to be paid 21 point whatever it was percent. It wanted to benefit fully from these interests that it acquired. What was the objective of the fourth — the application to leave to file a fourth amendment amended petition? I'm sorry? What was the — what was the purpose of seeking leave to file a fourth petition amendment? Your Honor, I wish I could answer that question. I was not the trial attorney and I wasn't part of that decision-making process. The trial attorney — one of the trial attorneys has since died, one has since retired, and I don't have an answer to that question. I think that it was to — Put aside whatever — what was the thrust of that amendment? What would the effect of that amendment have been had it been grounded, had it been filed? I honestly don't know. I don't have that amended petition or complaint here. I thought it was to cure the absence of a — to get before the court the party against which release had been grounded. Well, and that may very well be the — the prior incarnation of adversary — The reason I ask that, and I — if — excepting your — your analysis of the — of the race that's been created, the breach of fiduciary duties, et cetera, and that being that as a distribution, then there would have been no necessity to seek that amendment, would it? And I suspect that — that to the extent that that was any part of the rationale, that that was done just to keep the record as clear as possible, not necessarily because it was essential. I do think that it is clear from the way in which Judge — the bankruptcy judge structured his analysis that it started with the breach of fiduciary — Well, one suggestion is that the parties didn't take to do that because the constructive trust came from the judge, not from the parties. Yes, that's true, too. That was the analysis that he pursued. It — another way to look at it, whether it's a constructive trust or an accounting, but an accounting for where this property went and returning it to its rightful owners in an equitable and fair manner because but for the breaches of fiduciary duty, but for the seriously flawed and one could easily believe deliberately seriously flawed Safanad CBRE appraisal that failed to take into consideration all manner of details and facts that would have changed the 28.1 appraisal, less than zero appraisal, to something much more realistic that would have afforded the ticks some return on their investments. That's really, you know, the threat to exercise the power of attorney and take their property without any more ado. All of these things that were being done, these strong-arm tactics that were being engaged in by Woodlark and UTSA, and make no mistake, they were in lockstep. I mean, it's sort of hard. We can talk about them technically being legally separate entities, and in many respects they are, and in important respects, they were treated as legally separate entities. But when push came to shove, Harold Rosenblum was in charge of UTSA and Harold Rosenblum was in charge of Woodlark, and there's no way that he couldn't have known in both instances what the — what was actually going on. But, I mean, to justify a constructive trust that was never requested against a party that was never named, your theory is that there had to have been a breach of fiduciary duty. But UTSA — what's your authority that UTSA, as a tenant in common, owed other tenants in common a fiduciary duty? UTSA did not owe other tenants in common a fiduciary duty. The breach of fiduciary duty was solely Woodlark's. But because Woodlark set into motion all of these events that led to, ultimately, the state court action, the bankruptcy, the removal of the state court action to the bankruptcy court, the entire sale process in which there were multiple offers to purchase a property for sums well in excess of the $28.1 million that was in the CBRE appraisal, $28.1 million that was in the CBRE appraisal, all of these events started to take place. It was just a whole series of events coupled with multiple breaches of fiduciary duty that I detail in the briefing. I guess, simplifying my way of thinking of it, we'd have to assume alter ego status. And neither the bankruptcy court nor the district court issued any written findings of fact. So I'm parsing through what the bankruptcy court stated orally. Where is, in this record, is the clearest statement that UTSA was really just the alter ego of Woodlark so that we can attribute the same fiduciary breaches to it? I'm not sure that it's necessary to attribute the same fiduciary breaches to UTSA. Because once Woodlark set in motion all of these consequences, one of the things that was a consequence of Woodlark's breach was that UTSA was able to sweep in and take advantage of the ticks who just gave up. They just didn't want to fight anymore. And that would never have happened but for Woodlark's breaches of fiduciary duty. And what Judge King is saying is, hey, you cannot come in here, UTSA, and use the declaration of call agreement as a way to gather up all these properties which you shouldn't have been able to gather up as you did in the first place because you were never a signatory to that document. You're not going to be able to do that. And also, you're not going to benefit from your affiliate's breach of fiduciary duty. The proceeds of the sale that are the consequence, are tainted by Woodlark's breach of fiduciary duty, are going to be recovered and equitably distributed. Not recovered, but that transaction in essence is going to be set aside or is going to be disregarded. And those proceeds will now be distributed to the debtor ticks and the non-debtor ticks who received some distributions prior to the... I don't see why it wouldn't go all the way back to them. I don't see why your clients would get any of that money. It was never their ownership interest. I'm sorry? Why even if your theory had a legal basis and even if UTSA had been on notice they could defend against this theory, why would any of this 19% go pro rata? Why wouldn't it all go back to the parties that gave up and gave it to them that aren't here in this case? Those parties settled with UTSA. Right. But on your theory, what's the logic that it would go to your clients? That that money that was the product of the breaches of fiduciary duty should not go to benefit someone who was an entity that was not a signatory to the DCA that acquired those interests improperly only because its affiliate breached its fiduciary duties and therefore what are we going to do with it? We're going to distribute it equally or pro rata and UTSA will get some portion of that along with those ticks who remain involved. And that was the Bankruptcy Court's equitable distribution. It was not made under 105, although 105 case law is not relevant. This is not using 105 to circumvent other provisions of the Bankruptcy Code. This is an equitable remedy that is available under Texas law when there is a breach of fiduciary duty and under these circumstances that transaction leads to multiple events that can be undone to return the property to the people who would have had it but for the breaches of fiduciary duty. The breach of fiduciary duty was by Woodlock, not UTSA even though we say they're the same owner and yet UTSA was not given an opportunity to at least respond because they were not allowed into the proceedings. Shouldn't they have at least had an opportunity to respond to this theory even if it's a good theory and it's correct they weren't given an opportunity to even participate in the proceedings. Go for it. I happen to have connections with the person that controls the lights. I would like to answer your question if I may. All of these cases were tried together in a single trial under the adversary rules. The counsel for UTSA represented Woodlock as well. It's not a question that they didn't have an opportunity to respond. It's not a question that they weren't protected by the adversary rules. This was all tried of a piece and long before the trial there was an agreement that the bankruptcy judge would make the determination of how to distribute the sale proceeds. All of that was on the table. This is really not a question of due process. Where will we find that agreement? Pardon me? That agreement is in the sale order, I believe it appears. It's not an agreement but the determination was made in the sale order. In the confirmation order and in the plan which was proposed by UTSA and Woodlark acting as Woodlark under the name Woodlark there were also all kinds of agreements that these determinations would be made by the bankruptcy court following the trials. I'm way past my time. Thank you. Your Honor, Ms. Murray stated that the whole chain of events was set in motion by Woodlark's breach of fiduciary duty but that's not true. The chain of events was set in motion by the tenants in common failure to fund the operating expenses of the reserve which Woodlark then advanced as allowed under the agreement and which Judge King found were necessary amounts for the operation of the property and which benefited the property. These were sophisticated investors who were taking advantage of a tax-incentivized ownership structure and the owners that testified said that they knew that failure to respond to cash calls could result in the loss of their interests. Now I do want to come back to one thing on the breach of fiduciary duty because there were two things that the bankruptcy court found that constituted a breach of fiduciary duty. First was not getting the ad valorem tax refunds faster and the evidence showed that Woodlark got them as soon as they became aware of them after the lawyer that was handling it signed up Woodlark as a client so that their fee would be protected. As to the appraisal, there are a number of findings by the bankruptcy court as to how the appraisal was flawed and Ms. Murray has said that this appraisal was so bad that Woodlark must have wanted to use it to drive out the tenants in common. There are two problems with this. One is the appraisal was consistent with other valuations at the time. The property had been appraised by a third-party MAI appraiser as of January 1, 2014 for $28.4 million. In April of 2015, there was a third-party offer to purchase the property for $29 million and so Woodlark could not look at a third-party appraisal for $28.1 million and say this is so shocking that it must be wrong. Now the bankruptcy court erred when it made findings that the appraisal was flawed. There was no expert testimony provided that the appraisal was wrong or how the appraisal would have been different if certain changes had been made. What was the difference between that appraisal amount and the sales price? Approximately $5 million and that is the result of  in bankruptcy to market the property and to improve the value. The district court found that in that time your clients kept opposing the higher offers. The bankruptcy court did find that but that's not exactly correct. But all these points where you're saying not exactly correct, these are findings we would have to conclude are clearly erroneous. Are these arguments of yours necessary for you to prevail? I don't think so. I think the point is the bankruptcy court made findings as to an appraisal without any competent testimony. There was nothing to support those findings. Now as far as the I believe what the bankruptcy court specifically testified was that bankruptcy court didn't testify was that Woodlark was not much help in the sales process. We disagreed with that but the problem that came up was there was one initial party that Woodlark had bad experience with and had a history of retrading deals and so Woodlark objected to that sale and when a real purchaser the one that actually consummated the transaction for more money, Eris, came on board Woodlark said great, we want it all we want is a real sale not a pretend one. I had just one question legally as to the bankruptcy court's authority to reduce the 21% Opposing counsel cited as her best case the Maruko decision. Could you respond to that? Yes. The Maruko decision is not on point. It refers to determining it as of the petition date however that was not material to the court's decision instead you look at section 363J which says that the distribution shall be made after a sale and I rely on the bankruptcy code as my best authority. Thank you, your honors.